UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FOODMARK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 12-10837-DPW |
| v. | ) | |
| | ) | |
| ALASKO FROZEN FOODS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

MEMORANDUM AND ORDER
March 26, 2013

Foodmark brings this action for breach of contract under Quebec law alleging that Alasko Frozen Foods has refused to pay fees that it owes for terminating the parties' Agreement.

On October 17, 2011, Alasko informed Foodmark that it would terminate the Agreement and provided 90 days written notice.  The Agreement provides multiple ways to end the relationship between the parties. The parties advance conflicting interpretations of the particular language implicated.

Foodmark filed this action in state court and Alasko removed the action to this court on May 10, 2012.  The parties have filed cross-motions for summary judgment.  The parties, however, have not yet engaged in discovery.  Consequently, Foodmark's motion for summary judgment only seeks judgment on the issue of liability.

I will grant the Foodmark motion for summary judgment and deny Alasko's cross-motion.

# I.   BACKGROUND

## A.   *Facts*

Foodmark, Inc. is a U.S. company, based in Massachusetts, specializing in marketing and selling food products to large retailers such as supermarkets, major convenience store chains and club stores (for example, Sam's Club, Costco, and BJ's). Alasko Frozen Foods, Inc. is a Canadian importer, marketer, and trader of frozen fruits and vegetables, based in Quebec.  In 2006, Foodmark approached Alasko proposing a plan to bring Alasko's products to the American market.

The parties entered into a Sales Management Agreement on June 20, 2007.  The Agreement provides that Foodmark will provide private label sales management for Alasko in the United States in exchange for a management fee and broker commission, both based on percentages of total net sales of Alasko products in the United States.

In late July 2009, Alasko entered into its first agreement for distribution in the United States through Wal-Mart/Sam's Club.  Alasko began shipping its products to Sam's Club in October 2010 and first paid Foodmark approximately six months after it began shipping products under this new agreement.

The Agreement between Foodmark and Alasko provides for a "Non-Renewal Termination Fee" in the event Alasko decides not to renew the contract and an alternative sale-of-business fee in the

event Alasko decides to terminate the contract "upon the sale of [Alasko]."

Effective July 10, 2010, Alasko sold a controlling share of its business to Catteron Partners, a private equity firm that is not a party to this action.  For the next 15 months, Alasko continued to pay management and broker fees to Foodmark under the Agreement.  The parties met in November 2010 and again in March 2011 to discuss the operation of the Agreement under Alasko's new management.  Then, on October 17, 2011, Alasko notified Foodmark by letter that it would terminate the Agreement.  The letter stated,

> Pursuant to and as required by s. 11 of the Representation Agreement dated July 20th, 2007 between us ("Agreement"), this letter constitutes Alasko's notice to you of our termination of the Agreement effective 90 days from the date of this letter.

Since termination of the Agreement, Foodmark has demanded that Alasko pay the termination fees, and Alasko has refused to pay arguing that Foodmark is entitled to no fee for termination.

**B.   *The Agreement***

The amount of any termination fee depends on the total net sales of Alasko products in the United States leading up to the effective date of termination as well as which "term" is in effect when Alasko elects to end the relationship.  The three "terms" (periods of one or more years), defined in the Agreement correspond to termination fees based on different percentages of

"net invoice sales."  The first two terms last one year each.
(Agreement § 7-8.)  The third term lasts three years.  (*Id.*)  At
the end of each term, the Agreement automatically renews unless
one party terminates the Agreement or notifies the other party of
its intent not to renew.  (*Id.* §§ 8(a), 9(a).)  After the third
term, the Agreement automatically renews for successive three-
year terms "unless either party chooses to not renew the
Agreement according to the terms of Section 10.b."  (*Id.* §
10(a).)

Section 10 of the Agreement governs notification of intent
not to renew and termination during the third term.  Sections 8
and 9 govern non-renewal and termination for the initial one-year
term and the second one-year term respectively.  Their provisions
regarding notification of intent not to renew and termination
parallel those of Section 10.  Specifically, the relevant parts
of Section 10 read,

> **b. Notification of Non-Renewal:** Six(6) months
> prior to the end of this term, either party has the
> right to notify the other party, in writing, of its
> intent to not renew this agreement.
>
>          *    *    *    *
>
> **d. Non-Renewal of Agreement by [Alasko]:** If
> [Alasko] elects not to renew the Agreement for any 3-
> year term, the Agreement will terminate and [Alasko]
> will pay [Foodmark] a Non-Renewal Termination Fee as
> outlined in Section 10.f.
>
> **e. Sale of [Alasko]:** Upon the sale of [Alasko],
> [Alasko] has the right to terminate this Agreement and

4

[Foodmark] shall receive the Sale of Business Fee *from* [*Alasko*] as noted in Section 10.f.

> **f. Sale of [Alasko] Fee and Non-Renewal Termination Fee:** If the Agreement terminates under Sections 10.d. or 10.e., [Alasko] will be obligated to pay to [Foodmark] fees based on the net invoice sales for the last 13-week period of the term, annualized, for accounts managed by [Foodmark]; the fee schedule is as follows:

| Sales | Percentage |
|---|---|
| ≤$10 million | 10% |
| >$10 million – ≤$25 million | 8% |
| >$25 million | 6% |

During the process of contract negotiation, Alasko inserted another section regarding termination, which reads,

> **11. Termination**: Nothwithstanding [sic] Sections 8 b., 9 b. and 10 b., either party shall have the right to terminate the Agreement, upon not less than ninety (90) days prior written notice of termination to the other party.

Finally, but critically, the Agreement provides that it "will be governed by the laws of the Province of Quebec." (*Id.* § 15). Massachusetts choice of law rules permit parties to choose the law governing their Agreement. *See, e.g.*, *Morris* v. *Watsco, Inc.*, 433 N.E.2d 886, 888 (Mass. 1982) ("Massachusetts law has recognized, within reason, the right of the parties to a transaction to select the law governing their relationship.")

## II.   STANDARD OF REVIEW

Although the parties have agreed that Quebec substantive contract law should govern the Agreement, federal law governs the procedural aspects of this case. *Servicios Commerciales Andinos,*

5

*S.A.* v. *General Elec. Del Caribe, Inc.*, 145 F.3d 463, 479-80 (1st Cir. 1998).  Under federal law, a movant is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).

I "view the facts in the light most favorable to the party opposing summary judgment." *Rivera-Colón* v. *Mills,* 635 F.3d 9, 10 (1st Cir. 2011).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment. *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).  In dealing with cross-motions for summary judgment, I "must view each motion, separately, through this prism." *Estate of Hevia* v. *Portrio Corp.,* 602 F.3d 34, 40 (1st Cir. 2010).

## III. DISCUSSION

The parties dispute both the construction of the contract and the enforceability of the fee.  The contract construction dispute is grounded in the applicable substantive law – the law

of Quebec - but the parties provide no basis for determining the
enforceability of the non-renewal fee under Quebec law, electing
instead to cite Massachusetts law, which does not apply by terms
to the substantive issue of the enforceability of the fee.  I
first address the issues of contract construction, and then turn
to the enforceability of the fee.

## A.   *Contract Termination*

As in the United States, Quebec law dictates that the court
must apply the plain terms of the contract so long as they are
clear.  *Cartier* v. *The Queen*, 2007 CarswellNat 5862, 2007 TCC 37,
¶ 29 ("Where the contract is clear, the judge's role is to apply,
not interpret."); *Turenne* v. *Banque National du Canada* (1983),
1983 CarswellQue 259, J.E. 83-732, ¶ 23.  The rules of
interpretation set out in the Quebec civil code are only
necessary where there is clear doubt as to the meaning of the
contract.  *Cartier*, 2007 TCC 37, ¶ 29  ("[T]he rules of
contractual interpretation will only be applied where some
ambiguity exists."); *Turenne*, J.E. 83-732, ¶ 23.

The parties generally agree that the Agreement provides two
potential ways to end the relationship: (1) termination upon
notice and (2) termination "upon the sale of [Alasko]."  The
parties also agree that termination "upon the sale" triggers the
fee set out in Section 10.f of the Agreement.  The contract
construction dispute presents two questions: whether termination

7

pursuant to Section 11 of the Agreement constitutes a "non-renewal" for purposes of Section 10.d and whether Alasko's October 17, 2011 letter terminating the Agreement constituted termination "upon the sale."

### 1. Termination Upon Notice

Proper interpretation of termination upon notice in this case stands at the intersection of Sections 10 and 11.  Alasko argues that Section 11 is a separate and distinct means of terminating the Agreement that does not implicate non-renewal in Section 10.d or the Non-Renewal Termination Fee in Section 10.f. This position cannot withstand analysis under the plain, literal meaning of the contract language.

Section 10.d states that Alasko "will pay . . . a Non-Renewal Termination Fee as outlined in Section 10.f" if it "elects not to renew the Agreement for any 3-year term." Termination pursuant to Section 11, by its plain meaning, amounts to an "election not to renew the Agreement for any 3-year term." By electing to end the Agreement through termination, Alasko necessarily elects to end the contract, and *mutatis mutandis*, not to renew it.

Alasko argues that "termination" and "non-renewal" are distinct concepts within the Agreement and that if the parties had intended that termination under Section 11 would constitute a election not to renew, the parties surely would have linked

Section 11 expressly with Sections 10.d and 10.f through explicit cross-references.  I do not find this argument persuasive.

First, it would be quite difficult, indeed prohibitively so from a conceptual perspective, to interpret "termination" and "non-renewal" as entirely distinct - where "non-renewal" would trigger a fee and "termination" would not  - in light of the fact that the Agreement specifically refers to the fee in Section 10.f as a "Non-Renewal Termination Fee."

Second, and more fundamentally, in order to find these terms to be entirely distinct such that termination would not trigger a fee for "elect[ion] not to renew the Agreement," one would have to find that termination of the contract could not be an election not to renew.  That defies common sense.  An election not to renew, by its plain meaning, is a form of termination.  Indeed, termination would prove entirely ineffective if the Agreement renewed at the expiration of the term, notwithstanding the termination.  Cross-references in the Agreement might have served to make this fact clearer, but they are not necessary to understand the plain, literal meaning of the language in the Agreement.

Termination is distinct from non-renewal in that termination changes the end date of the Agreement, while non-renewal simply allows the Agreement to lapse at its pre-determined time without beginning a new term.  However, termination necessarily includes

non-renewal because, after the effective date of termination, no further terms begin.

This is further evidenced by the fact that Section 11 expressly states that it applies "notwithstanding" 8.b, 9.b, and 10.b. Sections 8.b, 9.b, and 10.b set out the minimum advance notice one party must afford the other if it plans not to renew the agreement during the first, second, or third term, respectively. If termination under Section 11 did not constitute an election not to renew, there would be no need to exempt Section 11 from the minimum notice requirements for non-renewal under Sections 8.b, 9.b, and 10.b.

The plain meaning of this language dictates that Section 11 is exempted from - and trumps - the contrary provisions of 8.b, 9.b, and 10.b. On the other hand, Section 11 does not exempt itself from the terms of 10.d or 10.f. Thus, although the minimum notice requirement in Section 11 trumps those of 8.b, 9.b, and 10.b, the termination provision of Section 11 is not exempt from the impact of Sections 10.d and 10.f. Therefore, Section 11 does not provide a means of terminating the Agreement that bypasses the dictates of Sections 10.d and 10.f, but rather provides a means of terminating the Agreement that remains subject to them. Because Section 11 provides for termination of the Agreement, and Sections 10.d and 10.f provide for a fee in the event Alasko decides not to renew the Agreement, Alasko's

termination pursuant to Section 11 remains subject to the fees imposed for ending the Agreement upon notice.

Both parties argue that the other's interpretation of the Section 11 90-day-notice provision renders the Section 10.b six-month-notice requirement impermissibly meaningless. *See* Civil Code of Quebec, S.Q. 1991, c. 64, s. 1428 ("A clause is given meaning that gives it some effect rather than one that gives it no effect."). Both parties also argue that the other's interpretation of Section 11 termination impermissibly renders meaningless Section 10.c, stating that non-renewal results in termination. *See id.* But neither interpretation actually renders Section 10.b or 10.c *meaningless*, rather these sections are without force in these circumstances.

Under either interpretation of Section 10.b, there would be very few situations, if any, in which it would make business sense to give six months notice for non-renewal, when it would be equally permissible to give three months notice for termination.[1]

---

[1]It is possible, however, that a situation might arise in which a party would prefer that the Agreement expire at the defined end date set out in Section 10.a rather than at a new date dictated by the 90 days-notice required by Section 11.  For example, Alasko may predict a drop in sales around the renewal date, in which case the fee would be lower if the Agreement expires then, making termination on the defined end of the term a rational business decision.  It is also possible that a situation might arise in which Alasko would want to give six-months notice before the termination of the Agreement rather than 90 days.  Upon receiving notice that the Agreement will end, Foodmark logically may diminish the energy expended on promoting Alasko products in the U.S. market, resulting in fewer sales and lowering the amount

Furthermore, Section 11 does not require precisely 90-days notice, but simply "not less than 90 days."  Alasko could terminate the Agreement pursuant to Section 11 with the same six-months notice as Section 10.b would otherwise require for non-renewal.  This does not deprive Section 10.b of meaning, but it does severely limit Section 10.b's application.  As discussed above, termination and non-renewal are overlapping but distinct concepts.  Alasko could have decided not to renew the Agreement and given six months notice even though the Agreement also permitted it to terminate the agreement and give not less than 90 days notice.  A clause is not rendered meaningless simply because it would not be a good business decision to invoke it.  A party may enter into a valid and enforceable agreement even if it would be inadvisable to do so from a business perspective.  *See Miller* v. *Lavoie*, 64 W.W.R. 359, 265 (B.C.S.C. 1966) ("[T]he courts are not empowered to relieve a man of the burden of a contract he has made under no pressure and with his eyes open merely because his

---

of the termination fee.  More notice might mean fewer sales, which in turn would mean a lower termination fee: a rational business calculation on Alasko's part. Additionally, if the parties understood Section 10.f to calculate the Non-Renewal Termination fee based on the 13-week period leading up to the date of effective termination after 90-days notice in the event of a Section 11 termination, but based on the 13-week period leading up to May 9, 2012 in the event of a Section 10.b election not to renew, Alasko's decision regarding which section to invoke would depend on its predictions of net sales over time.  Based on different predictions, either decision might make rational business sense.

contract is an act of folly."); GERALD FRIDMAN, THE LAW OF CONTRACT IN CANADA 320 (5th ed. 2006) ("[A] court applying equitable powers is not able, nor is it willing, to interfere with a concluded contract, otherwise not exceptional, merely on the ground that one party now finds that the original bargain he made is not to his taste.").  The fact that neither Alasko nor Foodmark is likely to choose to end the Agreement under Section 10.b when Section 11 remains a possibility does not render any clause meaningless and does not undercut the plain meaning of the contractual language discussed above.

The provision in Section 10.c stating, "[i]f [Foodmark] elects not to renew the Agreement . . . the Agreement will terminate" also still has meaning for the same reasons: Foodmark could "elect not to renew" the Agreement and allow it to expire at the close of a term, even though the termination provision in Section 11 would give Foodmark more control over the timing of termination and might, therefore, be a better business decision.

Whether or not applicable under all circumstances, Sections 10.b, 10.c and 11 still have meaning.  It is obvious that the confusion in this case is the direct result of artless drafting. Nevertheless, because it is still possible to make sense the Agreement, I apply the plain meaning of the language, which dictates that termination pursuant to Section 11 triggers the Non-Renewal Termination Fee.

13

2. Termination "Upon the Sale"

The phrase "upon the sale" in Section 10.e of the Agreement is arguably ambiguous.  The parties offer plausible, but mutually exclusive, interpretations of the phrase.  Alasko suggests that "upon the sale" means "at the time of sale, coincident with the sale, or at the occurrence of sale," and therefore that a termination "upon the sale" of Alasko, if any, must have occurred on July 10, 2010 when Alasko sold a controlling share of its business to Catteron Partners.  By contrast, Foodmark suggests that "upon the sale" contemplates a "termination relating to or arising out of" the sale of Alasko, and therefore that Alasko's October 17, 2011 letter constituted termination "upon the sale" because, Foodmark alleges, it was caused by Alasko's change in ownership and control following the sale.

Both constructions find dictionary support.  Webster's Dictionary provides definitions of "upon" capable of supporting either construction.  *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2517-2518 (1993) ("10a:(1) immediately following on : very soon after . . . (2) in answer to : in satisfaction of <upon the demand of government leaders . . . > . . . 10b: on the occasion of : at the time of.").  Definitions 10a(1) and 10b could support Alasko's construction that "upon" essentially means "contemporaneous with."  Definition 10a(2) can support Foodmark's construction that "upon" means an action taken in response or

14

answer to the sale.  The context of the Agreement does not shed
further light on the meaning of "upon the sale."

Alasko argues that, unlike Sections 10.b and 11, Section
10.e does not require any notice and is therefore designed to be
triggered by the effective date of the sale.  When a contract
contains ambiguous language, a court may analyze the intention of
the parties according to the Québécois canons of contract
construction, *Pomerlim, s.e.c.* v. *Societe Immobiliere du Quebec*,
2010 CarswellQue 434, 2010 QCCA 127, ¶ 49; *Societe de
Congeneration de St-Felicien* v. *Industries Piekouagame, Inc.*,
2009 CarswellQue 8081, 2009 QCCA 1487, ¶ 7-8 (holding that courts
properly consider testimony as well as documentary and parole
evidence in interpreting a phrase it finds to be ambiguous.)
Interpretation of ambiguous contract language through the lens of
the parties' intent generally presents a question of fact for the
jury.  *See Smart* v. *Gillette Co. Long Term Disability Plan*, 70
F.3d 173, 178 (1st Cir. 1995)(citing *In re Newport Plaza Assocs.*,
985 F.3d 640, 645 (1st Cir. 1993)).  Yet even after recourse to
the intent of the parties, "the evidence presented about the
parties' intended meaning may be so one-sided that no reasonable
person could decide the contrary," and the court may decide the
issue as a matter of law.  *Boston Five Cents Sav. Bank* v.
*Secretary of Dep't of Hous. & Urban Dev.*, 768 F.2d 5, 8 (1st Cir.
1985).  In this case, the parties have not yet engaged in

discovery such that I might conduct the kind of thorough analysis necessary to determine of their intent in drafting this provision,

However, because I conclude that Alasko owes Foodmark a Non-Renewal Termination Fee pursuant to Section 10.d, the ultimate determination whether the October 17, 2011 letter constituted a termination "upon the sale" is immaterial.

## B.   *Unenforceable Penalty*

The parties briefed whether the fee constitutes a penalty clause under Massachusetts law only.  They have briefed neither the choice of law issue, nor the question whether the provision is enforceable under Quebec law.  Nevertheless, since both are implicated, I provide the following analysis to frame the issues.

Alasko argues that if a Section 11 termination implicates the Non-Renewal Termination Fee, the contract will renew indefinitely and Alasko will have no way of ending the agreement without paying the fee.  This, Alasko argues, constitutes a penalty clause which is unenforceable under Massachusetts law. *See TAL Fin. Corp*. v. *CSC Consulting, Inc*., 844 N.E.2d 1085 (Mass. 2006) (holding a penalty clause unenforceable).  Foodmark counters that the Non-Renewal Termination Fee would not be a penalty clause under Massachusetts law.  However, this dispute make no difference here.  Even assuming, for the sake of argument, that Section 11 would constitute a "penalty" clause

under Massachusetts law, it is Quebec law that governs the
contract and under Quebec law, the clause is enforceable.

### 1. Choice of Law

Massachusetts law will enforce obligations of the parties
arising under foreign laws "if not contrary to [Massachusetts]
public policy or to abstract justice or pure morals, or
calculated to injure the state or its citizens," assuming
jurisdiction is proper. *Higgins* v. *Central N.E. & W.R. Co.*, 29
N.E. 534, 535-36 (Mass. 1892). This does not mean that
Massachusetts law controls wherever it is in conflict with Quebec
law; that would fundamentally defeat the purpose of applying
Quebec law. Rather, the dispositive question is whether there is
some substantial public policy reason that Massachusetts
interpretation of penalty clauses should, as a rule, control over
those of a foreign jurisdictions. *See Bragel* v. *General Steel
Corp.*, 21 Mass.L.Rptr 408, 2006 WL 2623931, at *4 (Mass. Super
Ct. Aug. 2, 2006) ("'[I]n the absence of any substantial
Massachusetts public policy reason to the contrary,'
Massachusetts' view of the enforceability of the arbitration
clause is not controlling, and this Court should turn to the law
of Colorado to determine whether the arbitration provision is
unconscionable.") (quoting *Jacobson* v. *Mailboxes Etc. U.S.A,
Inc.*, 646 N.E.2d 741, 744 (Mass. 1995))). Although Massachusetts
has determined that penalty clauses should not be enforceable in

the application of its own laws, *see Kelly* v. *Marx*, 694 N.E.2d
869, 871 n.6 (Mass. App. Ct. 1998) ("A term fixing unreasonably
large liquidated damages is unenforceable on grounds of public
policy as a penalty." (quoting Restatement (Second) of Contracts
§ 356)), I do not find any substantial Massachusetts public
policy reason that its law must control the interpretation or
enforceability of the Non-Renewal Termination Fee.

This is not a situation in which Massachusetts has an
interest in protecting those who do business in the state from
the impact of divergent foreign law.  In fact, it is the
Massachusetts party, Foodmark, pressing for application of Quebec
law.  There is nothing unfair in this situation about applying
Quebec law to Alasko, a citizen of Quebec that specifically
agreed to application of Quebec law in its Agreement with
Foodmark.  This is also not a case implicating Massachusetts's
interests as a state.  *See N.E. Data Sys., Inc.* v. *McDonnell
Douglas Comp. Sys., Co.*, 986 F.2d 607, 610-11 (1st Cir. 1993)
("There is no conflict with Massachusetts public policy here.
The dispute is essentially a private one, which . . . has no
third-party effects." (internal quotations omitted)).
Application of Quebec contract law would not impose any
substantial or inappropriate burden on the state or call for this
court to overstep its jurisdiction or powers.  Nor is Quebec law
such an extreme departure from the laws of Massachusetts as to

justify a refusal to apply the parties' stated choice of governing law. Massachusetts will not enforce penalty clauses, but will enforce liquidated damages clauses so long as they are not so extreme as to constitute a penalty. *See NPS, LLC* v. *Minihane,* 886 N.E. 2d 670 (Mass. 2008) (upholding a liquidated damages clause as not "grossly disproportionate" and therefore not a penalty).

The law of Quebec comes to a result similar to that of the law of Massachusetts through a different route. Under the law of Quebec, courts enforce penalty clauses, but also have the power to reduce the penalty if the penalty is abusive or in cases of partial performance. *See* Civil Code of Quebec, S.Q. 1991, c. 64, s. 1623 ("A creditor who avails himself of a penal clause is entitled to the amount of the stipulated penalty without having to prove the injury he has suffered. However, the amount of the stipulated penalty may be reduced if the creditor has benefited [sic] from partial performance of the obligation or if the clause is abusive.").

Finally, Alasko argued – for the first time at oral argument – that my decision in *NPS LLC* v. *Ambac Assurance Corp.*, requires the application of Massachusetts law to questions of unenforceability because "contractual choice of law provision[s] [are] not binding" on claims "about the validity of a contract's formation." 706 F. Supp. 2d 162, 168 (D. Mass. 2010) (citing

19

*N.E. Data Sys., Inc.* v. *McDonnell Douglas Comp. Sys. Co.*, 986 F.2d 607, 611 (1st Cir. 1993)).   Alasko's reliance on *NPS* is misplaced.   In both *NPS*, and in *N.E. Data Sys.*, plaintiffs claimed fraud in the inducement of the contract, and the courts considered whether the parties had ever entered into a valid agreement to begin with.   *See NPS LLC*, 706 F. Supp. 2d at 169 ("NPS alleges that Ambac cannot enforce the 2006 Agreement because it induced NPS to enter into the Agreement through fraudulent and/or negligent misrepresentations . . . ."); *N.E. Data Sys.*, 986 F.2d at 611 ("Th[e] special claim rests upon allegations of fraud. . . . Because this claim concerns the validity of the *formation* of the contract . . . the claim falls outside the contract's choice-of-law provision." (emphasis in original)).   It would be odd to apply a contractual choice-of-law clause when determining whether any part of the contract is valid in the first instance.   The same concern is not present in this case.   Neither party to this action alleges fraud in the inducement, and neither has denied the validity of contract formation.   There is, therefore, no reason to ignore the choice-of-law clause the parties validly agreed upon, and I apply Quebec law to determine the enforceability of the fee.

   2. Enforcement of the Fee

   Alasko has not made out an adequate showing that the Non-Renewal Termination Fee is unenforceable under the laws of

Quebec.[2]  Nor could it.  Penalty clauses are enforceable under

Quebec law.  Therefore, the Non-Renewal Termination Fee is

enforceable even if it disincentivizes termination in certain

circumstances.  Alasko has not undertaken to show that the fee

constitutes a penalty under Quebec law.  Nor, if it had, could it

make a case that this court should reduce the amount of the fee.

The fee is neither abusive nor does it need to be reduced for

partial performance.

    The fee is based on a percentage of Alasko's sales and is

therefore not abusive because it is reasonably proportionate to

Foodmark's loss.  *See Alta Ltée* v. *Corp. Des Maîtres Mécaniciens*

*en Tuyanuterie*, 1995 CarswellQue 202, 27 C.L.R.2d 243, ¶ 38; *see*

*also* Civil Code of Quebec, S.Q. 1991, c. 64, s. 1437 (defining

---

[2] While I apply Quebec substantive law regarding "penalty
provisions," I also note that even if Massachusetts law were to
apply, I would not find the Non-Renewal Termination Fee
constitutes an unenforceable penalty.  Alasko argues that the fee
makes it far more expensive for Alasko to terminate than to
continue renewal, and makes termination more profitable for
Foodmark than continued performance, thus depriving Alasko of a
"real option."  *See Blay* v. *ZipCar, Inc.*, 716 F. Supp. 2d 115,
119 (D. Mass. 2010) (quoting 14 Williston on Contracts § 42:10
(4th ed. 2010)).  However, it is by no means clear that a
termination fee no greater than 10% would always render perpetual
renewals the cheaper option.  More fundamentally, the fee is not
excessive.  It requires payment of no more than 10% of the
annualized revenue calculated by the previous 13 weeks.  Thus
Alasko would never owe more than 10% of the approximate value of
a year's worth of sales, approximating just over one month of
expected income.  This is hardly excessive, particularly
considering that Alasko has the right to cut off the agreement on
90-days notice - potentially depriving Foodmark of nine months
expected income if Alasko gives notice at the beginning of a
year.

abusive as "so departing from the fundamental obligations arising from the rules normally governing the contract that it changes the nature of the contract.").

Alasko has partly performed on the contract, paying Foodmark its contractually entitled percentage of sales from the first sales under the Agreement in July 2009 though termination of the Agreement on January 15, 2012.  But neither party has produced any evidence or argument to justify reducing the amount of the Non-Renewal Termination Fee based on Alasko's partial performance.

Nor is any reduction appropriate.  Alasko terminated the agreement effective January 15, 2012, and the term was set to expire on May 9, 2012, leaving nearly four months of the contact unperformed.  As discussed above, the Non-Renewal Termination Fee amounts to no more than 10% of annualized net invoice sales - the equivalent of no more than one and one half months of projected sales.  The full fee is therefore not duplicative of any partial performance.

## IV.  CONCLUSION

For the foregoing reasons, I DENY Defendant's motion for summary judgment (Dkt. 5) and GRANT Plaintiff's cross-motion (Dkt. 12) with respect to liability.  The parties shall file on or before April 18, 2013 a proposed joint schedule for a resolution of the remaining issue of damages and its predicate,

the proper meaning of the phrase "the last 13-week period of the term" in Section 10.f.

/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE