UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS


FOODMARK, INC.,                       )
                                      )
         Plaintiff,                   )    CIVIL ACTION NO.
                                      )    12-10837-DPW
v.                                    )
                                      )
ALASKO FROZEN FOODS, INC.,            )
                                      )
         Defendant.                   )
                                      )

                        MEMORANDUM AND ORDER
                         September 12, 2013

     Foodmark brought this action for breach of contract under

Quebec law alleging that Alasko Frozen Foods has refused to pay

fees it owes for terminating the parties' Agreement.  I have

granted Foodmark summary judgment as to liability, *Foodmark*, *Inc.*

v. *Alasko Frozen Foods, Inc.*, 2013 WL 1285539 (D. Mass. Mar. 26,

2013), and directed the parties to submit further briefing on the

remaining issues of damages and the proper meaning of Section

10(f) for calculating the termination fee under the Agreement.

*Id.* at *9.  Section 10(f) entitles Foodmark to a termination fee

calculated as a certain percentage of the annualized net invoice

sales for the last 13-week period of the term of the agreement

for accounts that Foodmark manages.

     First, Foodmark argues that it managed Alasko's relationship

with Sam's Club, whose invoice sales are the basis for

termination fees.  Second, it argues that the relevant time

period for calculating the annualized damages under the Agreement

is the 13-week period preceding the effective date of termination, January 15, 2012.  Ultimately, it contends that the appropriate damages calculation based on this time period amounts to $1,101,275.45.

Alasko's opposition challenges only the first argument - that the Sam's Club account qualifies as an "account[] managed by [Foodmark]."  It does not challenge either Foodmark's proposed interpretation of "the last 13-week period of the term" or Foodmark's methodology for calculating damages based on that interpretation.  But Alasko does argue Sam's Club invoice sales should not be included in the formula.  It further argues in the alternative that requested damages should be reduced based on partial performance.

I will grant Foodmark's motion for summary judgment.

## I.  BACKGROUND

Foodmark and Alasko entered into a Sales Management Agreement on June 20, 2007, under which Foodmark would provide private label sales management for Alasko in the United States in exchange for a management fee and broker commission, both based on percentages of total net sales of Alasko products in the United States.  The Agreement provides that it "will be governed by the laws of the Province of Quebec," (Agreement § 15), and Massachusetts choice of law rules permit parties to choose the law governing their Agreement, *see, e.g.*, *Morris* v. *Watsco, Inc.*,

2

433 N.E.2d 886, 888 (Mass. 1982) ("Massachusetts law has recognized, within reason, the right of the parties to a transaction to select the law governing their relationship."). I will continue to honor that Agreement here. *See Foodmark*, 2013 WL 1285539 at *7-9.

Section 1 of the Agreement states that "[Alasko] agrees to engage and establish [Foodmark] as its exclusive private label sales management team" for the United States territory. (Agreement § 1.) In relevant part, the Agreement assigns Foodmark responsibility for "manag[ing] and/or appoint[ing] brokers and insur[ing] that the product line is presented to the specified Target Accounts." (Agreement § 5 (c).) It assigns Alasko responsibility for "pay[ing] to all brokers, the Broker Commissions." (Agreement § 7(f).) As originally agreed upon, the management fee was 5% of net invoice sales and the broker commission was 3% of net invoice sales. (Agreement § 7(a)-(b).)

Foodmark identified TBG, a broker with connections to Sam's Club, and introduced it to Alasko. In late July 2009, Alasko entered into its first agreement for distribution in the United States through Wal-Mart/Sam's Club. As of one month later, in August 2009, Alasko contracted directly with TBG as broker for its relationship with Sam's Club, calling the contract a "Brokerage Agreement."

The parties dispute the extent of Foodmark's role in obtaining this arrangement with Sam's Club. Foodmark contends that it actively managed Alasko's relationship with TBG and Sam's Club, including reviewing agreements, reviewing packaging for the product, and mediating a dispute involving TBG. Alasko contends, and TBG agrees, that Foodmark played no role in the Sam's Club account whatsoever other than to introduce Alasko to TBG. In any event, on October 10, 2009, Foodmark and Alasko executed an amendment to their Agreement, reducing the amount of Foodmark's management fees. (Foodmark 56.1 ¶ 12.) That amendment reads,

> As per discussions between Lee Gavris and Frank Scarfo, we have agreed to a combined 5% management and broker commission for Sam's. This is contrary to the original agreement of %5 management and 3% broker commissions as stated in Sections 7a and 7b.
>
> Foodmark has agreed to pay the broker 3% for the first year. This is the extent of the contract [Alasko] has with TBG. However, at the start of year 2 (i.e. the end of TBG's first year contract), [Foodmark] has the right to change TBG's commission structure, per Frank Scarfo's and Lee Gavriss [sic] discussion.

After a private equity firm acquired Alasko in 2010, Alasko advised Foodmark not to perform any further work under the agreement pending Alasko's reevaluation of its U.S. strategy. Foodmark accordingly ceased all work under the Agreement after July 2010. On October 17, 2011, Alasko notified Foodmark by letter that it would terminate the Agreement. The effective date of that termination was January 15, 2012 as dictated by the Agreement's 90-day notice requirement. (*See* Agreement § 11.)

4

Section 10(f) of the Agreement governs termination during the third term of the Agreement - the term relevant to this action.  The termination fee provision reads,

> [Alasko] will be obligated to pay to [Foodmark] fees based on the net invoice sales for the last 13-week period of the term, annualized, *for accounts managed by [Foodmark]*; the fee schedule is as follows:
>
> | Sales | Percentage |
> |---|---|
> | ≤$10 million | 10% |
> | >$10 million - ≤$25 million | 8% |
> | >$25 million | 6% |

(Agreement § 10(f) (emphasis added).)  The Agreement does not specifically define "accounts managed by [Foodmark]" or the term "manage."  However, it does distinguish between management services and broker services, including separate responsibilities for compensating each.  (*See, e.g.*, Agreement § 7(a)-(b).)

Alasko continued to pay Foodmark the contractual management fee through the effective termination date, January 15, 2012.  The amount of the undisputed net invoice sales that Alasko obtained from Sam's Club and management fees that Alasko paid to Foodmark during the last 13 weeks of the Agreement are as follows:

5

| Time Period | Net Invoice Sales to Sam's Club | Management Fee Paid to Foodmark |
|---|---|---|
| 10/16/11 - 10/29/11 | $515,311.55 | $10,306.23 |
| 10/30/11 - 11/26/11 | $690,358.75 | $13,807.18 |
| 11/27/11 - 12/24/11 | $1,189,885.42 | $23,797.71 |
| 12/25/11 - 01/15/12 | $420,930.05 | $8,418.60 |
| **TOTAL** | $2,816,485.77 | $56,329.72 |

According to the applicable formula set out in Section 10(f), Foodmark would be entitled to a percentage of the annualized net invoice sales for this 13-week period.  The annualized value - found by multiplying the 13-week total ($2,816,485.77) by four - equals $11,265,943.08.  Foodmark is entitled to 10% of the first $10 million - amounting to $1 million - and 8% of the balance up to $25 million.  In this case, 8% of the $1,265,943.08 balance equals $101,275.45.  Thus, according to Foodmark's undisputed calculation of the termination fee, if applicable, Alasko owes Foodmark $1,101,275.45 plus interest.  To date, Alasko has not paid Foodmark the termination fee under any calculation.  Whether the termination fee is applicable turns on whether the Sam's Club business constitutes "an account managed by [Foodmark]."

## II.  STANDARD OF REVIEW

Although the parties have agreed that Quebec substantive contract law should govern the Agreement, federal law governs the procedural aspects of this case.  *Servicios Commerciales Andinos,*

*S.A.* v. *General Elec. Del Caribe, Inc.*, 145 F.3d 463, 479-80 (1st Cir. 1998). Under federal law, a movant is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).

I "view the facts in the light most favorable to the party opposing summary judgment." *Rivera-Colón* v. *Mills,* 635 F.3d 9, 10 (1st Cir. 2011). However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment. *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).

### III. DISCUSSION

In its summary judgment briefing regarding liability and at the summary judgment motion hearing, Alasko hinted that it might not agree with Foodmark's interpretation of which time period the Agreement contemplates when it states that the termination fee will be based on "net invoice sales for the last 13-week period of the term." (Agreement § 10(f).) However, Alasko does not

oppose Foodmark's current summary judgment motion as to damages on this basis, nor does Alasko dispute any of the damage calculations Foodmark included in its Rule 56.1 statement in support of this motion.  I will therefore treat these facts as admitted, the argument as undisputed, and I turn directly to the crux of the dispute on this motion - whether Alasko's relationship with Sam's Club constitutes an "account[] managed by [Foodmark]."

### A.    *"Managed" Under § 10(f)*

Both parties offer extrinsic authority for the definition of "managed," which the Agreement does not expressly define.  However, the issue is not so complicated.  It is neither necessary nor appropriate to resort to extrinsic evidence to construe the meaning of "accounts managed by [Foodmark]" because the contract is sufficiently clear regarding Foodmark's responsibilities.  *See St. Lawrence College of Applied Arts & Tech.* v. *Canada*, 2009 CarswellNat 1735, 2009 FC 545 at 16.  "Extrinsic evidence of the parties' intentions is not relevant to interpreting a contract where, when viewed objectively, the language of the agreement is sufficiently clear."  *Id.* (citing *Gilchrist* v. *Western Star Trucks Inc.*, 2000 BCCA 70, 73 B.C.L.R. (3d) 102, at 108).

The Agreement states that Foodmark will be the "exclusive private label sales management team" for Alasko.  (Agreement §

1.) One of its six enumerated responsibilities is "[t]o manage and/or appoint brokers and insure that the product line is presented to the specified Target Accounts." (Agreement § 5(c).) There is no dispute that Foodmark introduced the broker, TBG, to Alakso in order to insure that Alasko's products would be presented to Sam's Club - one of the accounts the Agreement targeted. Whatever else the definition of management might include, the contract specifically contemplates broker appointments as part of Foodmark's managerial responsibilities. Because this kind of introduction is one of Foodmark's specifically enumerated responsibilities under its "Sales Management Agreement," the Sam's Club account that resulted from the introduction is logically one under Foodmark's management, regardless of the level of Foodmark's subsequent involvement.

The fact that Alasko contracted directly with TBG after the introduction neither alters this conclusion nor is it surprising given the language and responsibilities under the Agreement. The Agreement specifically assigns Alasko responsibility for paying the broker. (Agreement § 6(f).) Therefore, the direct payment and contractual relationship between Alasko and TBG is consistent with the Foodmark Sales Management Agreement and is not evidence that the broker arrangement falls outside the ambit of the Management Agreement.

In fact, the direct contract between Alasko and TBG provides further support for the proposition that the Sam's Club account falls under Foodmark's management.  Under the Civil Code of Quebec, S.Q. 1991 c.64 § 1427, "[e]ach clause of a contract is interpreted in the light of the others so that each is given the meaning derived from the contract as a whole."  The agreement between Alasko and TBG is titled "Brokerage Agreement" and never once uses the terms "manage" or "management."  This is consistent with and corroborates the division of authority that the Foodmark Agreement contemplates between management (by Foodmark) and brokering (by whatever broker Foodmark appoints, in this case: TBG).  Because the Foodmark Agreement specifically contemplates separate managers and brokers, the presence of a separate brokerage agreement with TBG cannot and does not - as Alasko contends - vitiate Foodmark's position as the manager.

Moreover, the addendum that Foodmark and Alasko executed in October 2009 is consistent with Foodmark's management of the Sam's Club account and inconsistent with the idea that TBG's presence and activities take the arrangement outside the ambit of the Foodmark Agreement.  Although Alasko argues that this amendment is evidence that the Sam's Club account was not under Foodmark's management, the plain language of the addendum indicates otherwise.  It states that the parties had originally "agreed to a "5% management and 3% broker commission[]," but

10

during subsequent negotiations agreed to change that arrangement to "a combined 5% management and broker commission for Sam's [Club]," part of which Foodmark would pay to TBG.  Thus, the parties agreed that Foodmark would be entitled to management fees *for the Sam's Club account*.  Although Alasko argues that the addendum reduces Foodmark's fee in recognition of its more limited role,[1] it nevertheless confirms that the Sam's Club account falls under its management responsibilities.  Foodmark disputes Alasko's characterization of the motivation for the addendum, arguing that the parties altered the management and broker commissions to accommodate Alasko's tighter-than-expected margins.  Foodmark offers an email in which Lee Gavris of Foodmark wrote to Frank Scarfo of Alasko stating "I said we'd try to work on 5% for both [Foodmark] and broker, not the quoted 8% (5+3) since you told me margins are tighter . . . ."  However, this dispute over motivation is not material to this motion for summary judgment because the undisputed plain language does not contradict Foodmark's management role, as Alasko argues.

The addendum also forecloses any argument that TBG's expanded brokerage role vitiates Foodmark's role as manager.  Under the addendum, Foodmark bears responsibility for paying TBG and retains the right to change TBG's commission at the end of

---

[1] Alasko offers no evidence for this purported motivation behind the addendum other than the evidence it offers for the general proposition that Foodmark had no role in managing the account.

11

the first year.  Thus, the addendum underscores the continuation of Foodmark's managerial position, even if the reduction in commission reflects a corresponding reduction in actual operational responsibilities.

Finally, and perhaps most notably, Alasko consistently paid Foodmark the contractual management fees based on the same net invoice sales from the Sam's Club account that are also the basis for the termination fee calculation.  Section 7(a) of the Agreement requires Alasko to pay Foodmark a percentage of net invoice sales for all products.  Alasko does not dispute that it continued to pay the Section 7(a) "management fee" throughout the course of the Agreement based on sales to Sam's Club.  Section 10(f) also sets forth its fee as a percentage of net invoice sales, describing them as "accounts managed by [Foodmark]."  The parties' course of dealing indicates that the Sam's Club account falls within the Foodmark Agreement.  *See* Civil Code of Quebec, S.Q. 1991 c.64 § 1426 ("In interpreting a contract, the circumstances in which it was framed, the interpretation which has already been given it by the parties or which it may have received and usage, are all taken into account.").  A consistent reading of the word "manage" in its various iterations including as "management fee" counsels in favor of treating the management activities of Foodmark for purposes of the termination fee the same as for receipt of compensation for management services.  The

Sam's Club account therefore also falls within the Agreement for purposes of the termination fee, based on the same net invoice sales.

Although Alasko argues that the management fees under Section 7(a) of the Agreement are not limited to accounts that Foodmark managed as the 10(f) termination fee is, but rather also include net invoices for U.S. accounts that Foodmark did not manage, this position cannot be reconciled with the Agreement as a whole.  *See* Civil Code of Quebec, S.Q. 1991 c.64 § 1427. Section 1 of the Agreement provides that Foodmark will be Alasko's exclusive manager in the U.S. territory.  Any U.S. accounts would fall under its management or else be a breach of the Agreement.  Therefore, the distinction Alasko attempts to draw between accounts for which it paid management fees to Foodmark and accounts Foodmark managed does not comport with the plain meaning of the Agreement, taken as a whole.

### B.   *Reduction for Partial Performance*

The law of Quebec permits a court to reduce the amount of recovery under a liquidated damages clause if the clause is abusive or for partial performance.  Civil Code of Quebec, S.Q. 1991, c. 64, s. 1623 ("A creditor who avails himself of a penal clause is entitled to the amount of the stipulated penalty without having to prove the injury he has suffered.  However, the amount of the stipulated penalty may be reduced if the creditor

has benefited [sic] from partial performance of the obligation or if the clause is abusive."). Foodmark provided no response to Alasko's request for a reduction in damages in its briefing, after the discussion of the motion hearing in which I raised this issue, however, I conclude that no reduction is appropriate.

Alasko argues that I should reduce the amount of the liquidated damages to reflect the approximately $200,000 Alasko has already paid to Foodmark in management fees.  However, this kind of reduction is unrelated to any partial performance of the termination fee itself.  The Agreement separately provides for the management fees and the termination fee and the separate formulae for calculating each.  Alasko apparently urges the court to reduce the penalty, not because the creditor has benefitted from partial performance, but because the debtor asked the creditor to stop performing.  It has offered no authority in support of this position.  Nor, except in service of an illusory mathematical parity, is there any grounds for reducing the termination fee *pro tanto* to reflect the parties' amendment regarding reduction in management fees.  The two formulae are not linked under the original agreement and the amendment to the management fees calculus did not link them either.

Considered more broadly, it is evident the Agreement automatically renews for successive three-year terms unless one party elects to terminate as Alasko did in this case.  The

14

management services and management fees are, of course, part of the consideration under the Agreement, but the office of the renewal provision is to make the prospect of renewal a distinguishable aspect of the consideration.  The termination fee not only compensates Foodmark for lost revenue under the existing term, but also for lost revenue it might have received but for Alasko's decision not to renew the contract.  The termination fee provides Alasko the opportunity to end the Agreement and prevent *future* successive terms in exchange for a termination fee.  Alasko undertook obligations in exchange for Foodmark's management of the Sam's Club account, but it has not performed – in part or in whole – its obligation to pay a termination fee arising from its election not to renew the Agreement.

When Alasko terminated the Agreement effective January 15, 2012, the then-current term was set to expire on May 9, 2012, leaving nearly four months of the contact unperformed.  Although Foodmark may have received appropriate partial performance for the management fees generated on the then-existing three year term, it has not received any payment for damages incurred as a result of the Agreement's non-renewal for the then-current and potentially further terms, which the Termination Fee is designed to address.  I decline to reduce the amount of the Termination Fee.

## IV. CONCLUSION

For the foregoing reasons, I grant Plaintiff's motion for summary judgment (Dkt. 30) with respect to damages.  I direct the Clerk to enter judgment for the Plaintiff in the amount of $1,101,275.45 together with prejudgment interest from January 15, 2012.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE